IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| LONNY DUNLUCK, AARON ANDERSON, ROBERTO MERAZ-AVILA, JASON MATHIASON, and DAVID PURDY,<br><br>        Plaintiffs,<br><br>  vs.<br><br>ASSICURAZIONI GENERALI S.P.A. – UK BRANCH,<br><br>        Defendant.<br><br>ASSICURAZIONI GENERALI S.P.A. – UK BRANCH,<br><br>        Counter-Plaintiff,<br><br>  vs.<br><br>LONNY DUNLUCK, AARON ANDERSON, ROBERTO MERAZ-AVILA, JASON MATHIASON, DAVID PURDY and VITALITY NATURAL HEALTH LLC,<br><br>        Counter-Defendants. | CV 20–136–M–DLC<br><br><br><br><br>ORDER |

Before the Court are Plaintiffs and Counter-Defendants Lonny Dunluck's,

Aaron Anderson's, Roberto Meraz-Avila's, Jason Mathiason's, and David Purdy's

(collectively referred to as "Plaintiffs") and Defendant and Counter-Plaintiff Assicurazioni Generali S.P.A. – UK Branch's ("Generali") motions for summary judgment.  (Docs. 43; 51; 82; 85.)  The principal focus of these motions is whether a directors' and officers' liability policy issued by Generali to Eureka 93, Inc. ("Eureka") covers a $1,055,082.59 default judgment Plaintiffs' obtained against Vitality Natural Health LLC ("Vitality") in Montana state court.  For the reasons stated herein, the Court finds Generali is entitled to summary judgment on the issue of coverage.

## UNDISPUTED FACTS

Plaintiffs are Montana residents previously employed by Vitality, a foreign limited liability company that did business in Montana.  (Doc. 38 at 2.)  Plaintiffs all left their jobs between January and June of 2019 to join Vitality in its effort to "develop a cannabidiol processing plant in Eureka, Montana."  (Docs. 53 at 2; 56 at 3.)  On April 23, 2019, Vitality became a subsidiary of Eureka upon execution of an Amalgamation Agreement through which each entity obtained ownership shares in the other.  (Doc. 91 at 5–6.)  At some point, Eureka applied for a Director's and Officer's Liability Insurance policy ("the Policy") with Generali and it became effective on June 21, 2019.  (Docs. 38 at 2; 38-1 at 3.)  The Court will discuss below the specifics of the Policy where necessary to adjudicate the pending motions.

The employer-employee relationship deteriorated between Vitality and Plaintiffs, and by September of 2019, Vitality began paying Plaintiffs with bad checks, and ultimately ceased payments altogether. (Doc. 56 at 3.) Despite Vitality's non-payment of wages, Plaintiffs continued coming to work for several months with the hope they would eventually receive the wages they were owed. (*Id.* at 4.) The situation did not improve, and Plaintiffs ceased coming to work. (*Id.* at 6.)

Plaintiffs were understandably confused about their employment status and were unable to "receive straight or truthful answers" from Vitality regarding whether they were still employed. (Docs. 56 at 5; 92 at 4.) This confusion is illustrated by the fact that Plaintiffs submitted unemployment benefit forms in late December 2019 and early January 2020, with divergent answers regarding their employment status. For example, on Plaintiff Aaron Anderson's form, submitted on December 2, 2019, he stated he was still employed with Vitality. (Docs. 91-1 at 2; 92 at 5.) Plaintiff Jason Mathiason submitted a form on the same day and also indicated he was still employed by Vitality. (Docs. 87-9 at 2 2; Doc. 92 at 7–8.) Plaintiff Lonny Dunluck applied for benefits on December 3, 2019 and said the same thing. (Docs. 91-2 at 2; Doc. 92 at 7–8.)

Conversely, Plaintiff Roberto Meraz-Avila's form, submitted on December 2, 2019, indicated that he had been laid off or discharged by Vitality, with his last

3

day of work being November 20, 2019.  (Docs. 87-6 at 2; 92 at 6.)  Plaintiff David

Purdy applied for unemployment benefits on January 21, 2020 and simply put "?"

in the portion of the form asking about his employment status.  (Docs. 87-7 at 2; 92

at 9.)  Importantly, Vitality subsequently told the State that Plaintiffs had been

terminated on January 4, 2020.  (Doc. 92 at 12.)  Vitality's relationship to Eureka

changed during this period as well.  On December 4, 2019, Eureka and Vitality

executed an Agreement to Cancel Shares, Warrants and Options through which

each company gave up its shares in the other.  (Doc. 91 at 6; *see also* Doc. 23-4 at

241–47).

Everything came to a head on February 26, 2020, when Plaintiffs sued

Vitality in Montana state court, complaining they were terminated on January 4,

2020 without good cause in violation of Montana's Wrongful Discharge from

Employment Act.  (Docs. 53 at 3–4; 78-3 at 9–10.)  They also advanced claims for

breach of contact and unpaid wages.  (Doc. 78-3 at 10–11.)  Less than a month

later, Plaintiffs mailed a notice of claim to both Generali and another company

called Tysers,[1] at their offices in London.  (Doc. 38 at 3.)

This letter stated, in relevant part, that Plaintiffs had instituted a lawsuit

against Vitality and demanded Generali and Tysers "acknowledge receipt of this

---

[1] Tysers precise role in the events giving rise to this action is disputed.  Plaintiffs characterize
Tysers as a "claims administrator" while Generali classifies it as an "insurance broker."  (Doc.
56 at 9.)  This dispute does not impede adjudication of the pending motions.

letter and to defend and indemnify Vitality . . . for the claims asserted." (*Id.* at 3; *see also* Doc. 38-2.)  At the time they sent this letter, Plaintiffs had a copy of the Policy.  (Doc. 38 at 3.)  Neither Generali or Tysers responded to this letter (Doc. 56 at 7), and it is unclear whether COVID-19 and its associated impacts resulted in a delay in Generali opening the letter.  (Doc. 53 at 5.)

Despite being served with process, Vitality never appeared to defend the Montana state court lawsuit and neither did Generali.  (Docs. 38 at 3; 56 at 7.)  Plaintiffs eventually obtained a $1,055,082.59 default judgment in the state court proceeding.  (Doc. 38 at 3–4; *see also* Doc. 38-3.)  In its order, the state court found that "Vitality wrongfully terminated Plaintiffs without cause . . . on or about January 4, 2020."  (Doc. 38-3 at 3.)

Plaintiffs subsequently sent Tysers and Generali another letter on June 26, 2020, demanding that they tender Policy limits based on the state court default judgment against Vitality.  (Doc. 38 at 4; *see also* Doc. 38-4.)  Generali received this letter but did not respond.  (Doc. 38 at 4.)  Indeed, it appears Generali did not respond to Plaintiffs' letters until after the instant lawsuit was filed.  (Doc. 41 at 8.)

## PROCEDURAL BACKGROUND

Plaintiffs commenced this action on August 28, 2020.  (Doc. 1.)  Their operative complaint advances claims against Generali for: (1) a declaratory judgment that Generali must indemnify Vitality for the judgment obtained in the

underlying state court lawsuit; (2) negligence based on Generali's alleged failure to process and respond to Plaintiffs' letters; (3) equitable estoppel; (4) violation of Montana's Unfair Trade Practices Act; and (5) common law bad faith.  (Doc. 33.) Generali has advanced various counterclaims ultimately seeking a declaration that the Policy does not cover the $1,055,082.59 state court judgment.  (Doc. 41.)

The parties have now filed competing, fully briefed, motions for summary judgment.  (Docs. 43; 51 82; 85.)  Generali moved first (Doc. 43) arguing that it was entitled to summary judgment on all of Plaintiffs' claims.  (Doc. 44.)  The crux of Generali's argument is that the Policy, by its very terms, does not provide coverage for the state court judgment against Vitality for multiple reasons.  (*Id.*; Doc. 58.)  Plaintiffs' briefing argues the opposite, contending that the Policy does provide coverage.  (Docs. 52; 62.)  The Court held a hearing on the first two motions (Doc. 76) and ordered the parties to submit additional briefs on the effect of the Policy's choice-of-law provision (Docs. 77–79).  Following the filing of these motions and submission of additional briefing, the parties each filed new motions for summary judgment on an additional coverage issue in this case. (Docs. 82; 85.)  The Court finds these motions ripe for ruling.

## STANDARD

This Court can resolve an issue short of trial (i.e. summarily) if "there is no genuine dispute as to any material fact" and the prevailing party is "entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is genuine when there is sufficient evidence for a reasonable factfinder to return a verdict for the other party.  *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In meeting this burden, conclusory assertions are insufficient, and "non-speculative evidence of specific facts" is required.  *Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011).  In establishing facts, the parties may rely on evidence in an inadmissible form as long as the evidence could be introduced in an admissible form at trial.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (holding that "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."); *see also JL Beverage Co. v. Jim Bean Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("at summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial").  With these principles in mind, the Court turns to the merits of the issues presented.

## ANALYSIS

### I.      Choice of Law.

Because this Court is exercising diversity jurisdiction, it applies Montana's substantive law and federal procedural law.  *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003).  A state's substantive law includes its choice of law rules. *Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 966 (9th Cir. 1993). Accordingly, this Court must apply Montana's choice of law rules to determine the law governing the Policy's interpretation.

As a general matter, under Montana law "if a contract's terms are clear and unambiguous . . . the contract language will be enforced."  *Youngblood v. American States Ins. Co.*, 866 P.2d 203, 205 (Mont. 1993) (citing Mont. Code Ann. § 28-3-401 (stating "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity")).  This principle extends to choice-of-law provisions within an insurance contract.  *Id.*  But this general rule gives way when application of the unambiguous choice of law provision would violate Montana's "public policy or [be] against good morals." *Id.*  The *Restatement (Second) of Conflict of Laws* governs this analysis.  *Moodroo v. Nationwide Mut. Fire Ins. Co.*, 191 P.3d 389, 399–400 (Mont. 2008).

Under this approach, a contractual choice-of-law provision will be ignored "if three factors are met: (1) if, but for the choice-of-law provision, Montana law

would apply under § 188 of the *Restatement*; (2) if Montana has a materially

greater interest in the particular issue than the state chosen by the parties; and (3) if

applying the state law chosen by the parties would contravene a fundamental

policy of Montana." *Id.* at 400. Every factor must be met and "[i]f a clear choice-

of-law provision does not violate Montana public policy, there is no reason to

analyze factors (1) and (2)" outlined above. *Masters Grp. Intern, Inc. v. Comerica*

*Bank*, 352 P.3d 1101, 1113 (Mont. 2015); *see also HSBC Bank USA, Nat. Assoc. v.*

*Anderson*, 406 P.3d 416, 423 (Mont. 2017) ("If the parties' chosen [] law does not

contravene Montana public policy, it will be applied"). Because the Court finds

that application of the Policy's choice-of-law provision would not offend

Montana's public policy, it declines to address the first two factors.[2]

The Policy provides, in relevant part, "CHOICE OF LAW AND

JURISDICTION (FOR POLICY DISPUTES): This policy is subject to the law and

jurisdiction of a Canadian province or territory as determined by the relevant

Insurance Act(s)." (Doc. 38-1 at 4.) The parties agree that *if* this clause is

enforced, Ontario law would govern. (Docs. 78 at 2–3; 79 at 7.) Generali raises

---

[2] Of course, this Court need not engage in the choice-of-law analysis at all unless there is "an actual conflict between" the law selected by the Policy's choice-of-of law provision and Montana's. *Masters Grp. Intern*, 352 P.3d at 1116. For purposes of this analysis, the Court assumes *arguendo* that there is an actual conflict, *Ticknor v. Choice Hotels Intern, Inc.*, 265 F.3d 931, 938 (9th Cir. 2001) (adopting this approach), but recognizes Generali insists there is no conflict at all in this case. (Doc. 79 at 8–14.)

no challenges to this choice-of-law provision.  (Doc. 79 at 6.)[3]  Plaintiffs advocate

for a more complex approach in which some coverage questions are resolved

through application of Montana law and others are resolved through application of

Ontario law.  (Doc. 78 at 3–17.)

Specifically, Plaintiffs argue application of Ontario law via the Policy's

choice of law provision would violate Montana public policy, with respect to the

critical coverage provision in this case.  (Doc. 78 at 3–7.)  This provision provides:

C.     Employment Practice Liability Coverage

The **Insurer** shall pay on behalf of the **Insured** all **Loss** for which the
**Insured** becomes legally obligated to pay on account of any **Claim**
first made against any **Insured** during the **Policy Period** or, if
exercised, during the **Extended Reporting Period**, for an
**Employment Practice Wrongful Act**, and reported to the **Insurer** in
accordance with SECTION 7. of this **Policy**, provided always,
however, that no coverage is provided to a **Named Organization**
under this Coverage Extension unless such **Claim** is commenced and
continuously maintained against an **Insured Person**.

(Doc. 38-1 at 22 (emphasis original).)  Plaintiffs argue application of Ontario law

to this provision would violate Montana public policy because although it

"purports to require wrongful discharge claims be asserted against individual

corporate officers for coverage to exist," Montana's Wrongful Discharge from

Employment Act ("WDEA") "prohibits wrongful discharge claims from being

---

[3] Perhaps more accurately, Generali does not care what law the Court applies because its
overarching argument is that there is no coverage no matter what law applies.  (Doc. 79 at 6, 8–
14.)

asserted against corporate officers." (Doc. 78 at 7); *see also Buck v. Billings Mont. Chevrolet, Inc.*, 811 P.2d 537, 544 (Mont. 1991). Generali responds that a mere difference between the law chosen by the party's choice-of-law provision and the law of Montana is insufficient to establish a public policy violation. (Doc. 79 at 20.) The Court tends to agree with Generali and finds the Plaintiffs' argument stretches the applicable authority regarding public policy violations occasioned by choice-of-law provisions.

"For choice of law purposes, the public policy of a state is simply the rules, as expressed in its legislative enactments and judicial decisions, that it uses to decide controversies." *Phillips v. General Motors Corp.*, 995 P.2d 1002, 1015 (Mont. 2000). Prior cases illustrate public policy violations in the choice-of-law context. For example, in *Youngblood*, an insured obtained "an automobile liability insurance policy" that required the "subrogation of medical pay benefits" and contained an Oregon choice-of law provision. 866 P.2d at 204–05. Application of Oregon law would have validated the "subrogation of medical pay benefits" provision, because this form of subrogation was entirely permissible under Oregon law. *Id.* The Montana Supreme Court refused to honor the Oregon choice-of-law provision, however, concluding that Montana public policy clearly "refuse[s] to allow subrogation of medical payment benefits." *Id.* at 206 (stating "subrogation of medical payment benefits in Montana is void as against public policy. Here, the

11

choice of law provision in the insurance contract would result in medical payment subrogation under Oregon law. Because such subrogation violates Montana's public policy, that term of the insurance contract at issue here is not enforceable").

In *Swanson v. Hartford Insurance Company of the Midwest*, 46 P.3d 584 (Mont. 2002), the Montana Supreme Court reached a similar result.  There, the Swansons were insured by an automobile insurance policy that provided any disputes concerning "subrogation rights will be governed by Colorado law."  46 P.3d at 586.  The policy, consistent with Colorado law, also permitted the insurer to exercise subrogation rights before the insured "has been made whole."  *Id.* at 586, 590.  Faithful to *Youngblood*, the Montana Supreme Court refused to honor this choice of law provision, because "it is the public policy in Montana that an insured must be totally reimbursed for all losses as well as costs, including attorney fees, involved in recovering those losses before the insurer can exercise any right of subrogation."  *Id.* at 589 (stating "Applying *Youngblood*, we find the Colorado [choice of law] provision in the Hartford policy here void as against our public policy.  Application of Colorado law would result in the allowance of subrogation before an insured has been made whole, which violates Montana public policy").

The Montana Supreme Court's more recent holding in *Masters Group International, Inc. v. Comerica Bank*, 352 P.3d 1101 (Mont. 2015) is also illustrative.  In that case Masters had negotiated with Comerica Bank for several

years regarding "a loan to facilitate the purchase of [an] office products business and to establish a headquarters in Butte." *Id.* at 1105. To this end, the parties entered into various agreements, all containing Michigan choice of law clauses, but the relationship eventually deteriorated and Masters sued Comerica for "breach of the implied covenant of good faith and fair dealing, constructive fraud, deceit, wrongful offset, and interference with and loss of prospective economic opportunity." *Id.* at 1105–08. In the district court, Comerica unsuccessfully sought application of the Michigan choice of law provisions to the parties' contractual disputes. *Id.* at 1110–1111.

On appeal, the Montana Supreme Court reversed, and relevant to this case, in doing so, specifically rejected Masters' argument that application of the Michigan choice of law provision would violate Montana public policy. *Id.* at 1113–14. Masters argued that "because Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing, [unlike Montana], enforcing the choice-of-law provisions would be contrary to Montana public policy." *Id.* at 1114. The Montana Supreme Court disagreed, holding that:

> Although Michigan authority suggests that there is no stand-alone common law cause of action for breach of the implied covenant of good faith and fair dealing, Michigan courts appear to apply the covenant when addressing the performance and enforcement of contracts in breach of contract cases. Thus, the covenant of good faith and fair dealing could have been considered by the jury in the context of Masters' claims for breach of contract, had the District Court applied Michigan law. Masters is therefore mistaken in its contention

13

> that enforcing the choice-of-law provisions would be contrary to
> Montana public policy.

*Id.* (internal citations omitted).  *Masters* can therefore be read for the proposition

that if application of a contractual choice of law provision would result in the

contract having no covenant of good faith and fair dealing, which is inherent in

every contact under Montana law, then the choice of law provision contravenes

Montana public policy.

The foregoing authority can be summarized as follows.  A choice-of-law

provision will be ignored in favor of applying Montana law when its application

would occasion a result that is clearly forbidden by Montana law.  For example, a

contractual choice-of-law provision cannot be applied to validate a clause in the

contract that would clearly violate Montana law, such as one that would permit an

insurer to exercise subrogation rights before its insured has been made whole.  *See*

*Ticknor* (noting "The Montana Supreme Court has [] expressed antipathy toward

choice of law provisions that might require enforcement of a contractual provision

that would be invalid under Montana law").  Moreover, a contractual choice of law

provision cannot be applied so as to remove from a contract any essential aspect

required under Montana law, such as the implied covenant of good faith and fair

dealing.

Here, the Court has found no provision of Montana law, and Plaintiffs cite to

none, that requires an insurance policy to cover employment termination claims

brought against an employer's corporate officers.  To be sure, Montana's WDEA, which generally provides the exclusive state-law remedy "for a wrongful discharge from employment," Montana Code Annotated § 39-2-902, "does not envision lawsuits against corporate employees, officers or shareholders," just the employer. *Buck v. Billings Mont. Chevrolet, Inc.*, 811 P.2d 537, 544 (Mont. 1991).  But this does not mean it violates Montana's public policy for an insurer to write a policy that does not extend director's and officer's personal liability coverage to WDEA actions brought against the entity-employer.

Put another way, Montana law does not require insurers to extend director's and officer's coverage to wrongful termination claims brought against a corporate entity under the WDEA.  Contrast this with the undisputed public policy of Montana forbidding insurers from subrogating medical payment benefits, *Youngblood*, 866 P.2d at 205–08, or from subrogating payment of other benefits before its insured has been made whole, *Swanson*, 46 P.3d at 589.  In short, the Court finds no public policy violation if the Policy's Ontario choice-of-law provision is enforced at the expense of Montana law and will apply it to all issues presented.  Having resolved the choice-of-law issue, the Court turns its attention to whether Plaintiffs' judgment is covered by the Policy.

## II.    Coverage Questions.

The pending motions for summary judgment focus on three distinct

questions, asking whether coverage is precluded because: (1) Vitality is not an insured under the Policy; (2) Vitality did not defend against Plaintiffs' underlying state court lawsuit; or (3) no director or officer was sued or subjected to liability in the underlying state court lawsuit.  Before addressing these questions on the merits, the Court outlines the principles of Ontario law that will guide the Court's interpretation of the Policy provisions at issue.

Under Ontario law, interpretation of an insurance contract is driven by the "primary interpretive principle" that "where the language of the insurance policy is unambiguous, reading the contract as a whole, effect should be given to that clear language."  *Coast Cap. Equip. Finance Ltd. v. Old Republic Ins. Co. of Can.*, 2018 ONCA 540, ¶ 19 (Can. Ont. C.A.).  In *Coast Capital*, the Ontario Court of Appeal further stated:

> Where, however, the policy's language is ambiguous, general rules of contract construction must be employed to resolve that ambiguity. These rules include that the interpretation should be consistent with the reasonable expectations of the parties and should not give rise to results that are unrealistic or that the parties would not have contemplated in the commercial atmosphere in which the policy was contracted. Only if ambiguity still remains after the above principles are applied should the *contra proferentem* rule be employed to construe the policy against the insurer.

*Id.*; *see also Ledcor Const. Ltd. v. Northbridge Indem. Ins. Co.*, 2016 SCC 37, ¶¶ 49–51 (Can.).  And when Ontario authority is lacking on a particular topic, "American authorities may assist in interpreting insurance contracts."  *MDS Inc. v.*

16

*Factory Mut. Ins. Co.*, 2021 ONCA 594, ¶ 60 (Can. Ont. C.A.).  With these

principles in mind, the Court addresses the interpretive questions before it.

> **A.    Generali is entitled to judgment as a matter of law on the issue of whether Vitality was an "Insured" under the Policy on January 4, 2020.**

Generally speaking, the Policy provides coverage for covered liabilities

incurred by an "Insured." (Doc. 38-1 at 21.)  The Policy's definition of "Insured"

references "the Named Organization," which encompasses Eureka and its

subsidiaries.  (*Id.* at 13, 24, 26.)  What constitutes a "Subsidiary" under the Policy

is a bit complicated and includes:

> any corporate entity of which the Named Organization owns or
> owned, either directly or indirectly, more than fifty percent (50%) of
> the outstanding securities through one or more of its other
> Subsidiaries representing the right to vote for the election of such
> entity's directors or having the right, pursuant to written contract,
> certificate of incorporation, charter, by-laws, articles of association,
> limited liability company agreement, partnership agreement or other
> organizational or similar documents of an entity to elect, appoint, or
> designate a majority of such entity's directors, officers, general
> partners, managing members, members of the Board of Managers or
> their equivalent (hereinafter deemed as management control).

(*Id.* at 27.)  A corporate entity is no longer a "Subsidiary" within the meaning of

the Policy when Eureka "ceases to have management control of such entity."  (*Id.*)

Importantly, the Policy specifically excludes coverage for any liability incurred by

a corporate entity after it "ceased to meet the definition of 'Subsidiary.'"  (*Id.* at

29.)

From the start, Generali has defended this action by arguing that Vitality was no longer a subsidiary of Eureka, as defined in the Policy, when Vitality wrongfully terminated Plaintiffs. (Doc. 23 at 13.) Generali also advances a declaratory judgment counterclaim on this issue. (*Id.* at 21–23.) It now seeks summary judgment on this claim, arguing that Vitality ceased being a subsidiary of Eureka on December 4, 2019, nearly a month before Plaintiffs were wrongfully terminated on January 4, 2020. (Doc. 84 at 13–16.)

Plaintiffs resist summary judgment on this issue by arguing that Vitality constructively discharged them on or before December 4, 2019, when it was still Eureka's subsidiary under the Policy. (Doc. 86 at 4–8.) Plaintiffs also argue that even if this were not the case, Vitality remained Eureka's subsidiary at least until January 4, 2020, the latest date on which Plaintiffs could have been terminated. (*Id.* at 8–12.)

Plaintiffs first argument overlooks a critical point regarding the nature of the coverage at issue. Plaintiffs agreed at the hearing that their claim for coverage stems from the Policy's Employment Practice Liability Coverage provisions enumerated in the preceding section. For ease of the reader, this section provides:

C.    Employment Practice Liability Coverage

The **Insurer** shall pay on behalf of the **Insured** all **Loss** for which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against any **Insured** during the **Policy Period** or, if exercised, during the **Extended Reporting Period**, for an

18

> **Employment Practice Wrongful Act**, and reported to the **Insurer** in accordance with SECTION 7. of this **Policy**, provided always, however, that no coverage is provided to a **Named Organization** under this Coverage Extension unless such **Claim** is commenced and continuously maintained against an **Insured Person**.

(Doc. 38-1 at 22 (emphasis original).)  Critical to resolution of this issue, a "Loss" is defined as "damages, settlements, judgments . . . and Defence (sic) Costs."  (*Id.* at 25.)

Fatal to Plaintiffs' argument regarding a constructive discharge occurring on or before December 4, 2019, there are no damages, settlements, judgments, or defense costs stemming from such an event.  Instead, they have a judgment stemming from a wrongful discharge on January 4, 2020.  It does not appear Plaintiffs advanced a constructive discharge theory in state court, and they have no judgment to that effect.  In other words, even assuming Plaintiffs are correct, that they were constructively discharged by Vitality on or before December 4, 2019, there is no legal obligation stemming from that event.  Plaintiffs have not filled in the gap between their new constructive discharge theory and the necessity of some established legal liability arising from that discharge.  Without it, coverage is not triggered.

Plaintiffs' second argument fares no better.  It is undisputed that as of December 4, 2020, Eureka forfeited its shares in Vitality and no longer held any ownership interest in the company.  (Doc. 91 at 6–7.)  Plaintiffs argue this fact is of

little consequence, because whether Vitality was a subsidiary of Eureka depends not on the ownership of stock, but on its ability to exert "management control." (Doc. 86 at 8–9.)  Plaintiffs argue what constitutes "management control" is undefined by the Policy and thus "necessarily ambiguous."  (*Id.* at 9.)

The Court disagrees with Plaintiffs that "management control" is either undefined or ambiguous.  First, just because a term is undefined does not mean it is ambiguous.  *See MDS Inc.*, ¶¶ 68–77.  Meaning may be derived from the surrounding context.  *Id.*  Second, the Policy does define management control, albeit not in the definitions section.  The Policy specifically deems the term to mean:

> having the right, pursuant to written contract, certificate of incorporation, charter, by-laws, articles of association, limited liability company agreement, partnership agreement or other organizational or similar documents of an entity to elect, appoint, or designate a majority of such entity's directors, officers, general partners, managing members, members of the Board of Managers or their equivalent

(Doc. 38-1 at 27 (adding that this language is "hereinafter deemed as management control").)  Absent the Amalgamation Agreement, which nobody disputes was terminated as of December 4, 2019, Plaintiffs do not put forward any evidence establishing Eureka shared such a relationship with Vitality.

Instead, Plaintiffs argue that management control should be interpreted to include "administrative, supervisory, or managerial" oversight.  (Doc. 86 at 10.)  In

support of this position, Plaintiffs offer an affidavit from Mr. Meraz-Avila averring that Eureka remained involved in Vitality's operations after December 4, 2019. (Doc. 87-1 at 3–4.)  For example, Mr. Meraz-Avila states that Eureka continued to communicate with Vitality employees regarding administrative issues and "continued to manage and exercise as much control over Vitality as it always had." (*Id.* at 4.)  The Court finds this evidence irrelevant.

The critical point remains the Policy plainly defines management control as the ability to select Vitality's corporate management, including its "directors, officers, general partners, managing members, members of the Board of Managers or their equivalent."  (Doc. 38-1 at 27.)  There is no ambiguity and Plaintiffs have not created any factual dispute as to whether Eureka held such influence over Vitality on January 4, 2020, the only date that is relevant to the Court's analysis. As such, the Court finds there is no dispute as to a material fact on this issue and Generali is entitled to judgment as a matter of law.

> **B.    Generali is entitled to judgment as a matter of law on the issue of whether coverage is precluded because none of Vitality's officers or directors were sued in the underlying state court lawsuit.**

As stated above, the Employment Practice Liability Coverage, which is the critical coverage provision in this case, provides:

> The **Insurer** shall pay on behalf of the **Insured** all **Loss** for which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against any **Insured** during the **Policy Period** or, if

exercised, during the **Extended Reporting Period**, for an
**Employment Practice Wrongful Act**, and reported to the **Insurer** in
accordance with SECTION 7. of this **Policy**, *provided always,*
*however, that no coverage is provided to a **Named Organization***
*under this Coverage Extension unless such **Claim** is commenced and*
*continuously maintained against an **Insured Person**.*

(Doc. 38-1 at 22 (bold emphasis original, italicized emphasis added).)  The Policy

defines "Insured Person" as a "Director or Officer" which is further defined as the

"general partners of" Vitality, since it was organized as a limited liability

company.  (*Id.* at 23–24.)

Generali argues that this provision cannot provide coverage for Plaintiffs'

state court judgment because the underlying state court lawsuit giving rise to the

judgment was not maintained against any of Vitality's directors or officers, as

defined in the Policy.  (Doc. 44 at 19–26.)  Plaintiffs, who cannot dispute the

underlying state court lawsuit was not brought against any of Vitality's general

partners, resist the effect of this language by arguing the grant of coverage at issue

is ambiguous.  (Doc. 52 at 12–25.)  More specifically, Plaintiffs point the Court to

various other portions of the Policy to contend that coverage is not dependent on

their underlying lawsuit having been maintained against Vitality's general partners.

(*Id.*)  Generali has the better argument.

To the extent Plaintiffs think looking outside of the direct grant of coverage

they seek to invoke is important, the Court finds it most prudent to begin with the

cover page which describes the Policy as providing "Directors' and Officers'

Liability Insurance." (Doc. 38-1 at 1.)  In other words, from the first page of the

Policy it becomes unreasonable to believe that a *directors'* and *officers'* liability

policy would provide the sort of entity level coverage found in a standard

commercial general liability policy.  If the party acquiring the Policy were

confused, in this case Eureka, the directors' and officers' nature of the Policy

would be confirmed on the very next page and reinforced by the declarations page.

(*Id.* at 2, 13.)

The Court finds no ambiguity.  By its plain language, the Policy's

Employment Practice Liability Coverage clearly extends only to liabilities incurred

by Eureka or its subsidiaries *by virtue* of damages, settlements, judgments, or

defense costs, obtained against or incurred by, their *directors* or *officers*.

Circumstances in which this grant of coverage would be triggered are easy to

imagine.  Say, for example, Plaintiffs' state court lawsuit had been brought against

Vitality's general partners and the result had been the same.  And assume Vitality,

or maybe even Eureka, was under a legal obligation to indemnify Vitality's general

partners for that sort of liability.  Putting other coverage questions aside, then, the

coverage provision at issue may very well be triggered.

To obtain a result contrary to the plain language of the Policy, Plaintiffs

point to the Policy's use of the term "*Entity* Employment Practices Liability"

coverage in the declarations page and Endorsement 10. (Docs.  38-1 at 19, 23; 52

at 13–14 (emphasis added)).  The argument being because the Policy uses the word

entity in relation to the grant of coverage, it must cover liabilities incurred against

the entity directly.

But the use of the word entity is not inconsistent with the plain meaning

interpretation adopted above.   Under that interpretation, the Policy does provide

coverage to *entities*, but only when they become legally obligated to satisfy certain

liabilities incurred against or by their directors and officers.  Only a stretched and

strained reading of Policy provisions supports the interpretation that coverage is

afforded for claims not maintained against an officer or director.  To adopt this

reading would be to convert the Policy into a commercial general liability policy.

Eureka knew what it was getting—an insurance policy covering certain liabilities it

must pay to, or on behalf of, its directors and officers (including directors and

officers of its subsidiaries).

As a final matter, Plaintiffs argue that the interpretation adopted by the Court

above would achieve a result contrary to public policy and render the Policy's

coverage illusory.  (Doc. 52 at 25–28.)  This argument mirrors that advanced on

the choice of law issue, arguing that because wrongful discharge claims under the

WDEA cannot be brought against a company's directors or officers, it violates

public policy for the Policy to not cover a claim unless that is what occurs.  (*Id.*)

This argument fails for the reasons stated above—Montana law does not require an

insurer to cover the sort of claim at issue.  Stated another way, there is no public policy violation because it is not the public policy of Montana that insurers must cover claims brought against an entity under the WDEA.  Montana law does not extend WDEA liability to directors or officers and the Policy, which is a *directors'* and *officers'* policy, does not purport to cover resulting entity level liability.

As to the illusory coverage argument, the Court recognizes that Ontario courts have previously avoided interpretations that would render coverage illusory. *See Weston Ornamental Iron Works Ltd. v. Continental Ins. Co.*, 1981 CarswellOnt 1324, ¶¶ 16–19 (Can. Ont. C.A.); *Cabell v. Personal Ins. Co.*, 2011 ONCA 105, ¶¶ 14–17 (Can. Ont. C.A.) (characterizing it as the "doctrine of nullification of coverage").  In order for this doctrine to apply, the Policy provision must fail to cover the "most obvious risks for which [the Policy was] issued." *Cabell*, ¶¶ 14, 27.  The Court does not find that to be the case here.  The Policy at issue exists to cover liabilities incurred by entities when they are forced to satisfy or reimburse monetary expenses incurred by a director or officer.  The grant of coverage at issue is not designed to cover claims against the entity itself.   An entity seeking such coverage would purchase a commercial general liability policy that covered wrongful discharge claims.

Moreover, as Generali points out, the Policy covers a myriad of liabilities stemming from wrongful discharge claims brought against directors and officers.

(*See* 38-1 at 23 (defining "Employment Practices Wrongful Act")); Doc. 58 at 27–28.)  This is exactly the sort of coverage an entity purchasing a directors' and officers' liability policy that covers wrongful discharge claims would expect. Generali is entitled to summary judgment on this issue.  Given the Court's resolution of the first two coverage issues, the Court elects to not reach Generali's argument that coverage is precluded based on Vitality's failure to defend against the underlying state court judgment. Based on the foregoing, the Court will grant summary judgment in favor of Generali on its second (Doc. 41 at 35–40), fourth (*id.* at 38–40), and fifth (*id.* at 40–42) declaratory judgment claims.  The Court will also grant summary judgment in favor of Generali on Plaintiffs' first claim—which seeks a declaratory judgment that the judgment is covered by the Policy—based on the reasoning outlined above.

### III.   The Remaining Claims.

Generali's remaining declaratory judgment claims (Counts I, II, and VI) all advance different coverage arguments for which summary resolution was not sought.  A bench trial on these claims is unnecessary because the Court will afford Generali the principal relief it seeks—a declaratory judgment that the Policy does not cover the underlying state court judgment.  Accordingly, the Court will dismiss the claims as moot.

That leaves Plaintiffs' second, third, fourth, and fifth claims.  (Doc. 33 at 8–

12.)  Counts II, IV, and V all complain Generali violated Montana common law or Montana's Unfair Trade Practices Act by failing to provide coverage or otherwise respond to Plaintiffs' demands.  *(Id.)*  Because, as Generali points out (Doc. 44 at 27–28), there is no coverage under the Policy, these claims fail.  *Truck Ins. Exch. v. O'Mailia*, 343 P.3d 1183, 1188 (Mont. 2015).  The Court will grant Generali's motion for summary judgment on these claims.

Plaintiffs' equitable estoppel claim will also be summarily denied as well. Generali argued that Plaintiffs could not meet the required six elements for an equitable estoppel claim.  (Doc. 44 at 28–34 (citing *Arthur v. Pierre Ltd.,* 100 P.3d 987, 993–94 (Mont. 2004).)  Plaintiffs offer no argument that directly responds to this issue.  (*See* Doc. 52 at 33–34.)  As such, the Court will grant Generali summary judgment on this claim.  Because there are no claims left to resolve, the Court will enter judgment in Generali's favor and order this matter closed.

Accordingly, IT IS ORDERED that Generali's motions for summary judgment (Docs. 43; 82) are GRANTED and Plaintiffs' motions for summary judgment (Docs. 51; 85) are DENIED.

IT IS FURTHER ORDERED that the trial and any remaining deadlines or hearings are VACATED.

IT IS FURTHER ORDERED that any other pending motions are DENIED as moot.

27

IT IS FURTHER ORDERED that pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, the Court DECLARES that the Policy does not cover the default judgment for $1,055,082.59 obtained by Plaintiffs against Vitality in Montana state court.

The Clerk of Court is directed to enter judgment by separate document and close the case file.

DATED this 8th day of March, 2022.

Dana L. Christensen, District Judge
United States District Court

28